Arlyn BJERKE, Director of Emmons County Welfare, Petitioner and Appellee,

v.

D. T. and W. T., parents, Respondents and Appellants,

and

D. T., a child, Respondent.

In the Interest of D. T., a child.

Civ. No. 9236.

Supreme Court of North Dakota.

Dec. 23, 1976.

---

Richard E. Herr, Wishek, for respondents and appellants.

Donavin A. Grenz, State's Atty., Linton, for petitioner and appellee.

SAND, Justice.

The parents of DT, a 14-year old girl, appeal from an order of the Emmons County juvenile court adjudging DT to be a deprived child and removing her from their custody and control for placement with the Emmons County Social Service Welfare Board.

DT is one of seven living children in a family that resides in Emmons County, North Dakota. DT's father derives his income from farming on rented land and doing television repair work, and DT's mother works at a cafe. The two oldest children have left home and the other five, ranging in age from 16 to 5 years old, remain with their parents.

On April 14, 1975, when DT was in the eighth grade, she took twenty-three adult migraine aspirin tablets in an alleged sui-

cide attempt. She then made a telephone call to Dr. Orchard, a physician in Linton, who tried to persuade her to come in the hospital. DT's father overheard this telephone conversation and it was apparently he who took DT to the Linton hospital. DT remained hospitalized for one week. During her stay she was visited frequently by Dr. Orchard and by Marlene Baumgartner, an outreach worker for the Memorial Mental Health and Retardation Center at Mandan (hereinafter Center) who had been contacted about DT's case by the hospital administrator.

On May 12, 1975, Marlene visited DT's home, accompanied by Kay Lang, a social worker, and requested DT's parents to allow testing to be conducted at the Center to evaluate DT's emotional stability. DT's father said he would think about it and would let the social workers know what he decided, while DT's mother simply agreed to go along with her husband's decision. Neither of them was receptive to the request and claimed nothing was wrong with their daughter.

During a follow-up visit made on June 3, after a complete lack of response from DT's parents regarding the proposed evaluation, DT's father made it clear that he would not consent to testing. The following day the two social workers reappeared, along with Anne Hoff, the juvenile supervisor. DT's parents remained uncooperative. In the course of the discussion Mrs. Hoff raised the possibility that the matter would be referred to juvenile court if permission for the evaluation was not given. DT's father agreed at that point to allow the evaluation. An appointment was scheduled on June 10 for DT, and concurrent with it a session for DT's parents with another therapist, consistent with the Center's usual procedure. Although DT appeared for the evaluation, her parents did not. DT returned to the Center on July 15 for further testing. She was found to be of normal intelligence, but displayed signs of depression, hostility, and impulsiveness. Psychotherapy was recommended by the mental health clinician who evaluated DT, and the entire matter was reviewed at a Center staff meeting attended by the clinician, the two social workers, the juvenile supervisor, and Dr. Harold Hase, clinical director and chief psychologist at the Center. The outcome of the meeting was a three-part recommendation concerning treatment for DT: (1) placement outside the parental home, preferably in a foster home; (2) school consultation in conjunction with foster home placement; and (3) individual therapy in the community where placement is made. When informed of these results in August, DT's parents refused to consent to foster home placement but reluctantly agreed to see that DT got individual therapy.

At about this same time, Kay Lang received a request from the juvenile supervisor to do an investigation and home study of DT's home. An appointment was set up with DT's parents, but on the day of the appointment they called Kay to cancel, informing her that they would not be home. Attempts were made thereafter to set up another appointment, but Kay was unable to get the parents to fix a time. In September Kay drove out to the house with the deputy sheriff for the purpose of conducting the home study, but both parents were gone. A detailed home study was never done. Little account is made in the record of the next few months, but DT apparently did not receive further treatment at the Center.

The following January, DT's older sister contacted the two social workers and expressed concern that DT was threatening another suicide attempt. Kay Lang, Marlene Baumgartner, and Anne Hoff talked to DT, who said she did not want to stay at home any longer but wanted to be in a foster home, and would "get myself out one way or another." DT's parents were contacted as a result, whereupon DT became very upset and telephoned Kay Lang. She was afraid of what her father, who was not home yet, might do after finding out his daughter had been talking to the social workers. After hearing DT's agitation and her further threats of suicide, Kay decided to obtain a court order for emergency re-

moval of DT from her home. DT left on horseback for a neighboring farm, where she was picked up by Kay and the sheriff.

A petition was filed with the juvenile court by the director of Emmons County Social Services to have DT declared a deprived child, and a hearing on the petition was held on February 20, 1976. At the conclusion of the hearing the court ordered that DT have a complete physical and psychiatric examination within three days. Pending receipt of the medical reports, the court continued the matter and placed DT temporarily in custody of the Social Service Board. On March 29, after receiving the evaluation results from a Bismarck psychiatrist, the juvenile court entered an order removing DT from her parents' custody for placement in a foster home. The order also required that DT continue to receive psychiatric treatment by a qualified psychiatrist and that monthly reports be sent to the court. The matter was scheduled for further review on June 1, 1977. The order was amended on April 15, 1976, to allow for DT's placement in a psychiatric center for inpatient treatment, and DT was then transferred from the foster home to the State Hospital at Jamestown.

█ The parents argue correctly that they are entitled to a presumption that they are fit parents and entitled to custody of their daughter. Custody and companionship of one's children is the natural and fundamental right of every parent. But the right is not an unqualified one, and parents may not retain custody of their children under any and all circumstances. *In re A. N.,* 201 N.W.2d 118 (N.D.1972); *In re J. Z.,* 190 N.W.2d 27 (N.D.1971).

█ The law nonetheless recognizes this right to be a paramount one; thus the burden of disproving the presumption of parental fitness rests on the person who challenges it. *McGurren v. S. T.,* 241 N.W.2d 690 (N.D.1976).

The importance of parental custody is expressed in § 27–20–01, North Dakota Century Code, wherein it is stated that the purposes of the Uniform Juvenile Court Act

shall be achieved whenever possible in a family environment, "separating the child from his parents only when necessary for his welfare or in the interest of public safety." In giving effect to the purpose of the Act, we therefore require a grave reason before removing a child from her parents' custody. The reason alleged here was deprivation of the child, defined in § 27–20–02(5), NDCC.

" 'Deprived child' means a child who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian;

"b. Has been placed for care or adoption in violation of law; or

"c. Has been abandoned by his parents, guardian, or other custodian."

█ Not only must the petitioner show that the child is deprived within the purview of the statute, but the proof must be supplied by clear and convincing evidence. *In Interest of M. L.,* 239 N.W.2d 289 (N.D. 1976); § 27–20–29(3), NDCC. The stricter standard of review helps to ensure that the family unit will not be disturbed for insufficient reason.

█ We proceed to examine the case before us, taking note that our scope of review in a proceeding alleging deprivation of a child is different from and broader than in other cases tried to the court. We are called upon to re-examine the evidence in a manner comparable to that used in a trial de novo. *In Interest of M. L., supra.* In examining the files, records, and transcript of evidence, we give appreciable weight to the finding of the juvenile court. *In re H.,* 206 N.W.2d 871 (N.D.1973); *In re A. N.,* 201 N.W.2d 118 (N.D.1972).

Our study of the evidence in the case convinces us that DT is a deprived child, primarily because she was without proper parental care and control necessary for her mental and emotional health. The suicide

attempt and subsequent evaluation showed her to be an emotionally ill girl, in need of treatment as much as if she had a serious physical ailment. The staff at the Mental Health Center made their recommendations only after much deliberation, and believed them to be essential to DT's welfare. DT's parents, on the other hand, either refused or neglected to provide the treatment for their daughter. They rejected the recommendation that DT be placed in a foster home; they did not agree to treatment of any kind until faced with a possible court proceeding; they did not attend a therapy session scheduled for them as part of DT's program; they refused to allow a home study by the social worker; and they would not allow further counseling, and as a result treatment for DT was apparently discontinued after only two sessions.

■ But we think the controlling factor was their refusal to acknowledge that anything was wrong with DT. Neither parent seemed particularly concerned that DT had attempted to commit suicide by taking an overdose of aspirin. In their estimation she was only trying to get attention; they felt if she lacked anything, it was sufficient discipline, not psychotherapy. It was postulated that DT's father was ashamed to have a child of his receiving treatment for a psychological problem, and perhaps this contributed to his erroneous view that there was nothing wrong with his daughter.

Counsel for the parents argued that removal of DT from her parents' home was based upon the single act of refusal to allow foster home placement. It is true that after much urging they did agree to all of the recommendations, except transfer to a foster home. But their assurance was never carried any further. Under the statute, we must look to whether proper care was provided, not whether it was promised. The behavior of DT's parents clearly indicated their reluctance to do anything about DT's condition. The juvenile court's determination was not based upon the foster care issue, but simply upon the premise that

here was an emotionally ill child for whom help was not being provided.

It is well understood that a child can be found deprived by reason of physical abuse or failure to protect or provide for a child's physical well-being. But where emotional, psychological, or learning problems are involved, the necessity of State intervention may be just as strong. The Minnesota Supreme Court dealt with such an issue in *In re Welfare of Wachlin,* 245 N.W.2d 183 (Minn.1976), where an eight-year old boy was removed from his mother's home and placed in the custody of the County welfare department. The mother, who was separated and was the child's only custodial parent, was on AFDC.[1] When the child was four years old he was diagnosed as having a significant language delay problem, and it was recommended to his mother that he attend nursery school, receive speech therapy, and that his mother participate in a program to teach her methods to stimulate his language development at home. Her cooperation in the program was poor or nonexistent. The child was brought to only five of nineteen scheduled appointments in a special speech therapy program, and was discharged as a result. He was often late or absent from nursery school, and when he did attend he was dressed inappropriately or in torn or dirty clothing. The mother had made the statement that she kept the child in order to get her AFDC check. Proceedings were brought to have him adjudged a neglected child in order to allow for his placement in a stabilizing supervising home. The Minnesota Supreme Court affirmed the trial court's determination that the boy was neglected under the Minnesota statute defining neglected child as one:

"Who is without the special care made necessary by his physical or mental condition because his parent * * * neglects or refuses to provide it * * *." [Minn.St. § 260.015, subd. 10(d).]

and

"Who is without proper parental care because of the faults or habits of his

---

1. Aid to Families with Dependent Children.

parent * * *." [Minn.St. § 260.015, subd. 10(b).]

The Minnesota Court stated:

"It is undisputed that Timothy suffers from a neurological dysfunction which affects his ability to learn and use language. There is expert testimony in the record showing that because of Timothy's neurological condition he has a special need for speech therapy. There is also ample evidence of appellant's refusal to cooperate in attempts to provide this speech therapy to Timothy. Thus, the evidence presents a clear case of a child needing special care and a parent refusing to provide it. This evidence supports the trial court's conclusion that Timothy was a neglected child."

The instant case involved similar considerations to those in *Wachlin*. For whatever reason, the parent(s) in each case did not cooperate in a treatment program prescribed as necessary for the child. DT needed special care because of her emotional illness, and her parents refused to provide it or even to recognize that she needed it. It is evident that under these circumstances a finding of neglect or deprivation is justified to protect the child's welfare.

Considerable evidence was presented in juvenile court beyond the parents' refusal to provide or allow treatment. The record shows that DT often appeared at school unkempt, in dirty or unironed clothes. She had poor personal grooming habits, few friends, and on occasion she left the classroom in tears because of ridicule from her peers. The condition of the family home, observed briefly by Kay Lang and described further by family members, was crowded and littered. DT shared a bedroom with two sisters and slept on the floor for a period of time. The house had no running water. Livable space was almost nonexistent because DT's father did his TV repair work in the home and tools and appliances covered the kitchen table and almost all other pieces of furniture.

DT was ashamed of her home, she felt she was treated unfairly, and said she would rather be dead than living around her parents. Her father reportedly beat her at times with a strap, belt, or stick, and DT claimed to have shown her bruises to Mrs. Hoff, the juvenile supervisor, after one of these episodes.

■ Other evidence was presented about living conditions in the home which need not be described here. Obviously, it is not reason enough to deprive parents of custody that their home is not the best or most modern that could be offered to the child, so long as the child does not suffer physical or moral harm, or lack of food or clothing. Poverty, lack of education or of culture alone are never justification enough for severing the ties that bind families together. *In re Kelber,* 51 N.D. 698, 200 N.W. 786 (1924).

But the reason for removal of DT in this case is much more serious, focusing on lack of treatment for her emotional illness rather than conditions at home. That alone is reason enough for the order. But the conditions in DT's home are pertinent to the extent that DT's problems stemmed partially from her feelings about the house she lived in and about her parents. In light of the fact that DT could not cope with the home situation, foster home placement was appropriate. We make this statement without placing blame upon her parents, and recognize that DT's desperation to escape her home was perhaps as much a product of her emotional illness as of actual home circumstances.

■ During the juvenile hearing, evidence was presented regarding the financial resources of DT's parents. The evidence was objected to as irrelevant under North Dakota law and the objection was sustained. That sort of evidence, however, is both relevant and admissible, inasmuch as § 27–20–02(5), NDCC, allows a finding of deprivation *only* when the lack of parental care or control is "not due primarily to the lack of financial means of his parents, guardian, or other custodian. . . ." DT's parents, however, did not raise this issue in their defense, and the record shows that they were opposed to treatment for

other reasons. In addition, it was plain that social services would absorb whatever cost was involved in obtaining treatment for DT.

Counsel for the parents argued earnestly that State-employed professionals should not be permitted to substitute their judgment for that of the parents unless there is a finding of neglect, citing us to *In re C. F. B.*, 497 S.W.2d 831 (C.A.Mo.1973). That case is distinguishable, however. A five-year old hyperactive child was withdrawn by his mother from a day care program at a mental health center. She immediately, however, sought substitute care for the child, made arrangements with a private psychiatrist, and was anxious for her child to have psychiatric treatment. The court reversed the lower court's finding of neglect and held that withdrawal was not a denial by the mother of the child's need for treatment, but only an expression of her dissatisfaction with the program offered there. The child's condition had worsened while enrolled in it, and his mother was treated badly by the staff. The court said the parents had the right to choose between different doctors or institutions *so long as* they were willing and intended to provide some kind of appropriate treatment.

In the case at bar, the parents were not willing to provide treatment and were tenacious in their belief that their daughter needed none. We find that to be a crucial distinction. The social workers and DT's parents disagreed not only on method of treatment but on whether DT needed any assistance at all. At that point intervention becomes necessary.

■ We are sensitive to the argument that it is dangerous to allow the judgment of social workers to determine how a family is run. Parental autonomy should be favored and State intervention minimized.

This is especially true in situations where emotional or psychological harm is alleged, because of our relatively limited knowledge of child development and the nature and causes of psychological harm.[2] We believe that a dependent child should not be removed from the parents without their consent unless "diligent effort has been made to avoid such separation," and unless found needful to prevent serious detriment to the welfare of the child. *In re Klugman*, 256 Minn. 113, 97 N.W.2d 425 (1959).

We are not certain that the methods of treatment recommended for DT were the best or most prudent available. But we cannot say with certainty that some other avenue of treatment was preferable. The important point is that a child in need of some kind of assistance was not getting it. As for the choice of methods used to provide help, after considering all of the evidence, we in this instance defer to the juvenile court's judgment, including the portion of its order on foster care, especially because DT is not an infant or young child in its formative years, but a teenager. Contact with her parents is somewhat less important now, and this is heightened by her own strong preference for placement outside the parental home.

It is unfortunate that the holding on foster care placement, the issue on which disagreement was most heated, is now of little consequence. DT's condition worsened following the juvenile court hearing and institutionalization was required.

We emphasize the fact that removal of DT from her parents was not by permanent order. The juvenile court's order is subject to continuing review, and another hearing date has been set on the matter for June of 1977. The order is subject to modification should the parties demonstrate a substantial change of circumstances.

2. Wald, *State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards*, 27 Stanford L.Rev. 985 (1975). The article makes an excellent case for minimal State intervention based upon specific and well-delineated standards. One point emphasized by the author is that coercive State intervention should be premised upon specific harms to a child, not on the basis of parental conduct. We advocate this view and wish to point out that in the instant case our holding in no way implies that DT's parents are to blame for her illness. We simply find that DT was suffering emotional harm which was in some way related to her family environment, and that intervention was necessary for her welfare.

The judgment of the juvenile court is affirmed, and no cost is assessed to either party.

ERICKSTAD, C. J., and VOGEL, PEDERSON and PAULSON, JJ., concur.