267 N.W.2d 1 (1978)
In the Interest of K. P., M. D., K. D. and T. D.
Thomas D. McGURREN, guardian ad litem, Petitioner and Appellee,
v.
E. D., mother and R. D., father, Respondents and Appellants,
Executive Director, Social Service Board of North Dakota, Respondent.
Civ. No. 9444.
Supreme Court of North Dakota.
May 17, 1978.
Rehearing Denied June 28, 1978.
*2 Burt L. Riskedahl, Bismarck, for the children, K. P., M. D., K. D. and T. D.
Robert Bennett, Asst. State's Atty., Bismarck, for appellee.
Wheeler, Wolf, Wefald & Peterson, Bismarck, for appellants; argued by David L. Peterson and Rick D. Johnson, Bismarck.
PEDERSON, Justice.
This is an appeal by the parents, Mr. and Mrs. D., from a juvenile court order which concerned their children, M. D., K. D. and T. D., and also K. P., the son of Mrs. D. by a previous marriage. K. P.'s father is deceased. The family now lives in Plaquemines Parish, Louisiana. The younger two children, K. D. and T. D., were found to be deprived and the parental rights were terminated. The older two children, K. P. and M. D., were found not to be deprived, but an order was entered placing temporary custody with the Burleigh County Social Service Board. After making a broad review, as contemplated by § 27-20-56, NDCC, we affirm the finding of deprivation and the termination of parental rights as to K. D. and T. D. We reverse the order of the juvenile court placing custody of K. P. and M. D. with the Burleigh County Social Service Board and remand for an *3 order dismissing the petition as to the two older children.

I.
Only one issue is presented in that portion of the appeal which deals with the order continuing temporary custody of K. P. and M. D. with the Burleigh County Social Service Board. The parents assert that, because the juvenile court found that "those children are not deprived children pursuant to the definition found in § 27-20-02(5) of the North Dakota Century Code," it had no alternative but to dismiss the petition and return K. P. and M. D. to their parents' custody. The petitioner does not dispute their contention. We also agree. Section 27-20-29(1), NDCC, provides in part:
"If the court finds that the child is not a deprived child . . . it shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding."
The juvenile court's continuing jurisdiction over K. P. and M. D. was entirely dependent upon a finding that they were, in fact, deprived. In Interest of M. L., 239 N.W.2d 289 (N.D.1976). Accordingly, it was improper for the juvenile court to continue custody with the Burleigh County Social Service Board, even temporarily.

II.
The juvenile court terminated the parental rights of Mr. and Mrs. D. as to their younger children, K. D. and T. D.
The juvenile court may terminate parental rights only after making three separate and distinct findings: (1) that the child is a deprived child as that term is defined in § 27-20-02(5)(a), NDCC; (2) that the causes and conditions of the deprivation are likely to continue or will not be remedied; and (3) that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral or emotional harm. Section 27-20-44(1)(b), NDCC. In Interest of R. H., 262 N.W.2d 719 (N.D.1978); In re H., 206 N.W.2d 871 (N.D.1973). The juvenile court's finding must be supported by clear and convincing evidence. Interest of R. W. B., 241 N.W.2d 546 (N.D.1976).
If the court should adjudicate that a child is, in fact, deprived (pursuant to § 27-20-02(5), NDCC), or that the facts support a termination of parental rights (pursuant to § 27-20-44, NDCC), it may make any of several "orders of disposition best suited to the protection and physical, mental, and moral welfare of the child." Section 27-20-30, NDCC.[1] When the child involved is under ten years of age and a previous order exists which removed the child from the care, custody and control of his parents, the court must determine if the child is adoptable before the previous order may be extended. Section 27-20-36(6), NDCC. As amended, S.L.1975, Ch. 280, § 5.
Section 27-20-02(5)(a), NDCC, defines a deprived child as one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian." We have explained the term "proper care" as that which will meet those "minimum standards of care which the community will tolerate." In Interest of R. H., 262 N.W.2d at 724, supra. On appeals from juvenile court orders we give appreciable weight to the findings of the juvenile court but we also make a broad review of "the files, records, and minutes or transcript of the evidence." Section 27-20-56, NDCC. Interest of R. D. S., 259 N.W.2d 636, 637 (N.D.1977).

III.
Is there clear and convincing evidence that K. D. and T. D. are, in fact, deprived children? We think there is.
*4 The parents cite In re J. V., 185 N.W.2d 487 (N.D.1971), as supporting the proposition that because the children were properly cared for in foster homes from April 1974 until the present time, the children cannot have been deprived. The parents' suggestion that the juvenile court look to the quality of the foster care is not novel. We rejected a similar argument in the case of In re H., 206 N.W.2d 871 (N.D.1973), in which we distinguished In re J. V., supra. In re H was a case where a sixteen-year-old mother at no time had had custody or control of her child. Counsel for the mother argued that the child was not deprived because the child, while at no time having received any parental care, had at all times had other proper care.[2] After explaining that "the spirit or intention of the law prevails over the letter thereof," (cite omitted) we said:
". . . we now liberally construe the definition of a `deprived child' . . . so as to allow the juvenile court to take custody of a child pursuant to § 27-20-30, N.D.C.C., solely upon the basis of prognostic evidence clearly and convincingly indicating that a mother will be incapable of caring for her child . . . ."
In re H., 206 N.W.2d at 875, supra. See Waagen v. R. J. B., 248 N.W.2d 815 (N.D.1976).
Additional reliance of the parents on the more recent case of In Interest of M. L., 239 N.W.2d 289, supra, is likewise misplaced. There, a petition alleging deprivation was filed only after a divorced mother had actually been hospitalized for a mental illness. A psychiatrist had examined her and recommended approximately two months' therapy. Testimony in that case revealed no indication of deprivation other than that resulting from the mother's hospitalization. The juvenile court ordered the children placed with their grandparents. It was a later juvenile court order, which followed a hearing wherein the issues of deprivation and custody were intermixed, that this Court reversed. The juvenile court found that the mother had been rehabilitated. It was that finding which was inconsistent with the finding of deprivation. In the instant case we have no corresponding finding that the mother has been rehabilitated of her mental illness. Instead, the testimony most favorable to the parents indicates that her condition is "stabilized" through the use of "a rather large dose" of the drug Lithium Carbonate.
A juvenile court faced with the duty of determining whether or not a child is "deprived" has a difficult task. This task is made more difficult when the parents have not actually had custody of the child for a period of time. Such a situation in no way lessens the responsibility of the juvenile court.
". . . a child should not have to be subjected to actual deprivation before custody is given to the juvenile court." Waagen v. R. J. B., 248 N.W.2d at 819, supra.

In In re H., 206 N.W.2d at 874, supra, we construed § 27-20-02(5)(a), NDCC, "to include within its definition of a `deprived child' the child of a mother who, while never having had the opportunity to care for her child and thereby demonstrate her maternal abilities, is shown to be presently incapable of providing proper parental care for her child." [Emphasis added.] It is clear, both from the juvenile court's findings of fact and from the statements made when its decision was orally announced from the bench, that the parents were found to be presently incapable of providing proper parental care for K. D. and T. D. Our review of the files, records and transcript of the juvenile court proceedings leads us to the conclusion that clear and convincing evidence supports that finding of the juvenile court.[3] We therefore affirm *5 the conclusion of the juvenile court that T. D. and K. D. are deprived children in that they are "without proper parental care or control . . . and the deprivation is not due primarily to the lack of financial means of their parents."
The dissent of Justice Sand seems to hold that Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), requires a different result in this case. Stanley entitles an unwed father to a hearing on his fitness before his children are taken from him and further forbids to the State a presumption of his unfitness. In North Dakota there is no presumption of unfitness. To the contrary, § 27-20-44(1)(b), NDCC, which provides for the termination of parental rights, and under which the instant case was decided, has been interpreted to require the petitioner to prove facts which support a termination of parental rights by clear and convincing evidence. Interest of R. W. B., supra. This is not a presumption against the father, it is a presumption in his favor. No one has suggested that the notice requirements set forth in Stanley were not met. Sections 27-20-21, 27-20-22, and 27-20-23, NDCC, establish notice requirements which satisfy the Stanley decision. The record shows that all requirements were complied with.
The juvenile court found that the younger children were deprived. It was not necessary that the court find specifically that the father was unfit. The trial court used the correct standard, i. e., that the care the parents would provide would not be "proper care" (§ 27-20-02(5)(a), NDCC) or, as we have explained that term, the care would not meet those "minimum standards of care which the community will tolerate" (In Interest of R. H., supra). While the parents remain together the juvenile court need not find, and the petitioner need not prove, that the children would be deprived if one or the other parent was not in the picture.

IV.
Are the conditions and causes of the deprivation of T. D. and K. D. likely to continue and not be remedied? We believe that the evidence clearly and convincingly shows that the conditions and causes of the deprivation will continue.
Considerable evidence was taken on this subject during the course of the juvenile court hearing. Two social workers with the Plaquemines Parish Offices of Family Services, Belle Chasse, Louisiana, testified. The first was Juanita Messa, whose contact with the parents was limited to a period of time when Mrs. D. was not taking her Lithium medication. The purpose of the contact with Mrs. Messa was to improve the parents' home conditions so that they might obtain custody of their children. Mrs. Messa's regular contacts with the parents ended when the parents separated in February of 1977. She had no contacts with the parents after they reconciled in April of 1977 because the case was transferred to another worker. Mrs. Messa's testimony included the points: (1) as of April, 1977, the prognosis for the parents' marital relationship was poor; (2) she (Mrs. Messa) did not think Mrs. D. understood the emotional or physical needs of her children, or that the four children, being of varying ages, might have different needs; (3) the parents' relationship was so unstable that they could not tolerate the return of the four children; (4) the Parish Office of Family Services could not provide the counseling and assistance that would be necessary should the children be returned to the parents' home; and (5) there is no other agency which could make available the services the parents would need at the particular area in Louisiana in which they live.
Cheryl Campos was the social worker who took over the parents' case in April, *6 1977. Her counseling with the parents involved a period of time when the mother was regularly taking the Lithium medication which was prescribed for her condition. Mrs. Campos noted a considerable improvement in Mrs. D.'s condition. Nonetheless, when Mrs. Campos was asked whether or not it would be advisable to return custody of the children to Mr. and Mrs. D., she answered: "For the sake both of Mr. and Mrs. . . .[D] and the children I would not recommend it." She further explained, "Mr. and Mrs. . . . [D] have attained a level of stability that was very hard for them to achieve. They have had marital difficulties and financial difficulties and emotional problems to contend with and they have struggled with them and to some extent they have worked them out in a way that seems to keep them functioning very well right now. I think if the children were returned to them the marital relationship would be severely strained, certainly the financial situation would be a disaster and emotionally I think it would be more of a burden than they could successfully handle despite their great desire to do so. I think that their adjustment and their stability right now is fragile and to put a severe burden on them would be as destructive for them as for the children." Mrs. Campos stated flatly that she did not think the parents were capable of providing proper parental control for the children. She additionally stated that Mrs. D.'s illness is as stable as it ever would be and as controlled as it could be on her medication. Mrs. Campos did not think the situation could continue to get better. She opined that it had reached a peak. Mrs. Campos also stated that the parents experienced repeated financial difficulties, even though Mr. D. was regularly employed and had satisfactory earnings. She had no opinion as to why financial difficulties persisted.
The most positive prognosis for the parents comes from Dr. Wm. VanVeen, a Louisiana psychiatrist, who saw the parents for the purpose of evaluation. Dr. VanVeen did not testify at the hearing. His report was entered into evidence as the court's exhibit. The report acknowledges that the parents think the time is right for them to have their children back, and then states: "I would tend to agree." In making a prognosis for Mrs. D., he states: "Prognosis is good as long as Mrs. . . . [D] continues taking Lithium. Prognosis would be quite guarded if she discontinued this medication." In evaluating Mr. D., Dr. VanVeen noted no mental disorder.
Also submitting a report was a Louisiana psychologist, Dr. Anthony Savoca, who evaluated Mrs. D. but made no prognosis, either of her potential for improvement or of her ability to care for a family. His report nonetheless reveals factors which support the prognosis of Mrs. Campos. He reports: "Hostile and critical tendencies obstruct free-flowing empathy and self-preoccupation seems to interfere with warm interpersonal relationships." We consider the report to be indicative of the insurmountable problems which would result from a return of K. D. and T. D. to the home of Mr. and Mrs. D.
While Justice Vogel's dissent appears to dismiss the report of Dr. Savoca out of hand, it nevertheless suggests that we accord greater weight to two comments in Dr. VanVeen's report than we accord to the entire testimony of Mesdames Messa and Campos. Although it is acknowledged that a psychiatrist possesses skills and qualifications which afford his opinions some deference, neither this court nor the trial court is required to abide by those opinions. While this court exercises a broad review on appeals from the juvenile court, we do not ignore the findings of that court. In the instant case, both Mrs. Messa and Mrs. Campos testified at length and were subjected to skillful cross-examination. As Dr. VanVeen was not called to testify, his views were not subjected to cross-examination. The juvenile court was entitled to consider that fact in determining the weight to be given to that report.
Based upon its observation of Mrs. D., upon her testimony and upon testimony of the other witnesses, the juvenile court found that Mrs. D. "would be unable to *7 cope with the presence of four children in her household even with her continued use of the drug Lithium." Considering all of the factors before us, we conclude that the petitioner has shown, by clear and convincing evidence, that the conditions and causes of the deprivation of T. D. and K. D. are likely to continue or will not be remedied.

V.
Will T. D. and K. D. probably suffer serious physical, mental, moral or emotional harm because of the conditions and causes of the deprivation? The evidence clearly shows that the children are deprived children, and additionally shows that the deprivation is likely to continue. Petitioner has adduced considerable evidence which clearly shows that there is no awareness on the part of T. D. of who her biological parents are.[4] K. D., while aware that she has biological parents, has minimal knowledge of them and no relationship with them. Though, as biological parents, Mr. and Mrs. D. have a great desire to care for these children, the evidence clearly reveals their incapacity to do so. Likewise, the evidence clearly reveals that T. D. and K. D. may be harmed by continued foster care placements because of their awareness that they, unlike most children, do not live with their "real" parents. Under the circumstances of this case, we are convinced that T. D. and K. D. will be harmed, physically, mentally, morally and emotionally, by either a return to their biological parents or a prolonged continuation of foster care. We conclude that the evidence clearly and convincingly shows that T. D. and K. D. are suffering, and will probably suffer, serious physical, mental, moral or emotional harm due to their deprivation and the likelihood of its continuance.

VI.
Are T. D. and K. D. adoptable? The evidence reveals that not only are both T. D. and K. D. adoptable, but that prospective adoptive homes await them, contingent upon the results of this appeal.

VII.
Although it is in no way determinative of the issues in this case, we wish to repeat our admonition that North Dakota law does not permit a party to a proceeding to be appointed as a guardian ad litem for a child. Section 27-20-48, NDCC. Thomas McGurren was appointed guardian ad litem for all of the children in 1974. The record indicates that he continues in that capacity. We are aware that the appointment of the Juvenile Supervisor of Burleigh County as the guardian ad litem for these children predates our comments in In Interest of R. H., 262 N.W.2d at 726, supra. When the children's guardian ad litem became the petitioner in the instant case, a different guardian ad litem should have been appointed. However, no prejudice to the rights of the children resulted as they were ably represented by counsel.
Clear and convincing evidence supports each of the three findings required before parental rights may be terminated. Additionally, the evidence supports the finding that K. D. and T. D. are adoptable and that an order of disposition terminating parental rights is in the children's best interests. The juvenile court is to be commended for a very lucid and carefully considered order.
*8 This case is remanded to the juvenile court solely for the purpose of entering an order dismissing the petition in regard to K. P. and M. D. The order of the juvenile court is, in all other matters, affirmed.
ERICKSTAD, C. J., and PAULSON, J., concur.
VOGEL, Justice, dissenting.
In applying the law set forth by the majority to the facts presented in this case, I cannot agree that there is clear and convincing evidence that K. D. and T. D. are deprived children so as to warrant the drastic step of terminating parental rights.
As pointed out by the majority, Section 27-20-02, subsection 5a, defines a "deprived child" as one who:
"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian; . . ."
The majority cites the case of In re H., 206 N.W.2d 871 (N.D.1973), as authority for including within the definition of "deprived child":
". . . the child of a mother who, while never having had the opportunity to care for her child and thereby demonstrate her maternal abilities, is shown to be presently incapable of providing proper parental care for her child." 206 N.W.2d at 874.
In re H. involved a 16-year-old unmarried mother who had never had custody and control of her child. The court there was concerned that a child not be subjected to actual deprivation prior to the juvenile court's assuming custody.
The facts in the present case differ substantially. Here, the parents had physical custody of their four children and had the opportunity to demonstrate their abilities as parents. At the time the children were removed, K. P. was 10 years of age, M. D. was 5, K. D. was 2½, and T. D. was 13 months old. The reason for the removal of the children is not entirely clear from the record; however, one witness testified that complaints from neighbors about the children's being left alone provided the impetus for the removal. All the evidence presented concerning the physical and mental well-being of the children was positive. There was no evidence that the children were abused or neglected prior to the time that they were removed from the parental home. Upon being placed in foster homes, none of the children demonstrated any unusual behavior problems. The two older children are top students and get along well with almost everybody. The district court had an opportunity to interview the two older children and stated that K. P. "is a mature young boy who I think was more at ease with myself than I would have expected ninety per cent of the children would be. He talked freely. He was nice appearing, polite, and the Court was sincerely impressed with the soundness of some of the things he talked about and the manner in which he presented himself." Surely the parents are entitled to some credit for this result.
The majority completely ignored the evidence concerning Mrs. D.'s demonstrated maternal abilities and, instead, concluded that Mrs. D. is presently incapable of providing proper parental care. The facts upon which the majority reached this conclusion are not stated.
Mrs. D. was diagnosed as suffering from a manic-depressive condition and the drug Lithium was prescribed for her, which she began to take regularly in April of 1977. Testimony indicated that this treatment helped considerably to stabilize Mrs. D. Both Mr. and Mrs. D. testified that their marriage is the best it has been in eight years.
Two social workers from Louisiana testified based upon their contacts in that State with Mr. and Mrs. D. Juanita Messa's contacts consisted of 13 personal visits in that State and about the same number of telephone conversations during a 3½-month period, *9 all of which took place during the time Mrs. D. was not taking Lithium. Statements and opinions based on contacts with Mrs. D. prior to the time that she was regularly taking Lithium should be accorded little weight in determining her present ability to care for her children. Ms. Messa had no contact with the children. She testified that Mr. and Mrs. D. came to all of the sessions which were set up except for one which was cancelled due to illness.
The other Louisiana social worker, Cheryl Campos, had only two personal contacts with Mr. and Mrs. D., both of which took place while Mrs. D. was taking the Lithium medication. Ms. Campos testified concerning her first encounter with Mrs. D. She stated that at first Mrs. D. exhibited the manic state and then later became depressed. She testified that, "When asked very innocuous little questions she [Mrs. D.] seemed to feel that the weight of the world was depending on her coming up with the right answer." It is not surprising that Mrs. D. felt that her answers to the questions asked by the social worker were crucial to her attempt to regain custody of her children. Ms. Campos gave her opinion of Mr. and Mrs. D.'s ability to provide care for their children based upon her clinical knowledge of Mrs. D.'s illness. Admittedly, her opinion is only speculation. She stated that Mrs. D.'s inability to function with her illness untreated was the primary reason that the marriage was not working and the children were not being properly cared for.
The evaluation of the parents by Dr. Wm. Van Veen, a Louisiana psychiatrist, is recognized by the majority as the most positive prognosis. It would seem that more weight should be given to the evaluation of a licensed psychiatrist concerning his clinical knowledge of Mrs. D.'s manic-depressive condition than to the opinion of a social worker. Dr. Van Veen described Mrs. D.'s response to Lithium as a "rather dramatic stabilization of her mood." He also stated that "Both Mrs. [D.] and her husband think that the time is right for them to have their children back and I would tend to agree. That is, as long as Mrs. [D.] continues to take Lithium, which she should do indefinitely, the probability is that she will no longer have severe mood swings that would lead to bizarre or irrational behavior or significant marital difficulty."
Dr. Van Veen also evaluated Mr. D. and concluded that there was nothing to indicate any significant mental problem in Mr. D. I am at a loss to understand why his parental rights to his children should be terminated.
Dr. Anthony Savoca, a Louisiana psychologist, evaluated only Mrs. D., and his evaluation was based upon various psychological testing methods.
The State has a very heavy burden of proof in cases such as this, and this burden is not met where the evidence leaves only an inference that the children are deprived. This court recognizes that termination of parental rights is a drastic measure which should not be ordered except upon a proper showing by clear and convincing evidence. See Interest of R. D. S., 259 N.W.2d 636, 639 (N.D.1977):
"`It is no slight thing to permanently deprive a parent of the care, custody and society of a child, or a child of the protection, guidance and affection of a parent, notwithstanding that the parent has erred in the past, and especially where there is yet a possibility that the parent may later demonstrate a rehabilitation by sufficient conduct and character in accord with the accepted standards and duties of motherhood.' [Emphasis added.] State v. Grady, 231 Or. 65, 371 P.2d 68, 69 (1962)."
As we stated in Interest of R. D. S., supra, 259 N.W.2d at 638,
"A showing of parental misconduct without a showing that there is a resultant harm to the child is not sufficient. See footnote 2 in Bjerke v. D. T., 248 N.W.2d 808, 814 (N.D.1976), citing Wald, State Intervention on Behalf of `Neglected' Children: A Search for Realistic Standards, 27 Stan.L.Rev. 985 (1975)."
Mrs. D. had ten years to demonstrate her maternal abilities, and there is scant evidence that she was incapable of providing *10 proper parental care and no evidence that the children were harmed as a result of the care she provided. Mrs. D. recognized her mental problems and consulted with her minister, who was going to arrange for someone to take care of the children until she could handle the situation. Her seeking assistance from others under such circumstances demonstrated the exercise of good judgment.
The majority stresses the financial problems of the parents as related by social workers. The financial means of the parents is not a proper consideration upon which to base a finding of deprivation. Sec. 27-20-02, subsec. 5a.
It should also be emphasized that the question of who serves as the psychological parent of a child is not properly to be considered when determining whether the child is "deprived" within the meaning of the statute, but is an important consideration only after deprivation has been clearly shown.
In determining whether Mr. and Mrs. D. are presently capable of providing proper parental care, their past efforts demonstrating their abilities should be considered as an important indicator. In addition, Mrs. D.'s response to Lithium treatments showed a drastic improvement in the stabilization of her mental condition as well as her marriage. Both Mr. and Mrs. D. expressed a sincere desire to regain custody of their children and are prepared to continue counseling in the event custody is returned to them.
I also emphasize that there is practically nothing in the record to support the termination of the parental rights of the father.
The State has not borne its burden of proving by clear and convincing evidence that the two younger children are deprived. Without a determination of deprivation there is no authority to terminate parental rights.
SAND, J., concurs.
SAND, Justice (dissenting).
I concur with the dissenting opinion of Justice Vogel and give an additional reason for my dissent.
The proceedings on the termination of the parental rights disclosed that very little, if any, significant consideration was given to the father of the children. In Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the United States Supreme Court said that as a matter of due process of law the unwed father, like other parents, is entitled to hearing on his fitness before his children are taken from him and that the State may not presume unfitness.
In this case, we have a wedded father who, I believe, is entitled to as much consideration as an unwed or a putative father, as stated in Stanley, supra. A determination that the mother is unfit in itself does not include a determination that the father is also unfit. Any such presumption is unwarranted and would be invalid.
For this additional reason, I would reverse and remand to the trial court to conduct a further hearing not only to correct the deficiencies, if the facts warrant, as expressed in Justice Vogel's dissenting opinion, but also to consider the fitness of the father before any parental rights are terminated.
NOTES
[1] This Court, in In Interest [Custody] of D. G., 246 N.W.2d 892, 895 (N.D.1976), equated the concept of "best interests of the child" with the statutory formulation found at § 27-20-30, NDCC.
[2] Baby H. was placed in foster care on the date of her birth.
[3] In his dissent Justice Vogel asserts that this court "completely ignored the evidence concerning Mrs. D.'s maternal abilities." The evidence of Mrs. D.'s maternal abilities in the past shows that she had some difficulties caring for her children, and that those difficulties culminated in the children's removal without her objection. Since that removal, the children have remained in foster care for approximately four years. The children have apparently done well there. The dissent would give "Mrs. D.'s maternal abilities" credit for the children's progress in foster care.

Justice Vogel also objects to a lack of stated facts in this opinion. The facts are in the record and we are satisfied, as was the juvenile court, that the petitioner has met the burden of proof in showing that the children are deprived.
[4] The petitioner, appellee here, correctly points out the significant factor of the "psychological parent" concept in termination proceedings. In so doing, he unfortunately fails to distinguish between the two phases of a juvenile court hearing. The presence of psychological parents, whether or not the same individuals as the biological parents, will play a crucial, and often determinative, role in the court's efforts to make a disposition which is in the best interest of the child. It is not a proper concern of the court in the adjudicatory phase of the hearing. The term "psychological parent" refers to the relationship between adult and child based on "day-to-day interaction, companionship, and shared experiences." Beyond the Best Interests of the Child by Freud, Goldstein, and Solnit [New York: The Free Press (1973)], p. 19. The Washington Supreme Court, in a custody case, In re Palmer, 81 Wash.2d 604, 607, 503 P.2d 464, 466 (1972), stated: "[T]he function of parenthood is not purely a matter of biology. Persons other than natural parents may occupy the relationship of parent to the child." (Cite omitted.)