In the Interest of J. K. S., a child.

Cynthia A. ROTHE, Petitioner and Appellee,

v.

G. S., Respondent and Appellant.

and

P. S. and J. K. S., by her guardian ad litem, Mart Daniel Vogel, Respondents.

Civ. No. 9476.

Supreme Court of North Dakota.

Jan. 8, 1979.

Cynthia A. Rothe, Asst. State's Atty., Fargo, petitioner and appellee, pro se.

C. Charles Chinquist, Fargo, for respondent and appellant.

Mart Daniel Vogel, Fargo, guardian ad litem and attorney for J. K. S., a child.

VANDE WALLE, Justice.

The mother of J. K. S., a girl born in May, 1977, appeals from a juvenile court order that found her daughter to be a deprived child, pursuant to Chapter 27–20, N.D.C.C., and placed the child under the care, custody, and control of the Cass County Social Service Board. We affirm.

J. K. S. (whom we will refer to hereinafter as "Jane," a pseudonym) was born prematurely in a Fargo hospital on May 5, 1977, and remained in intensive care in the hospital until June 14, 1977. At the time of her birth Jane weighed three pounds, two ounces. The mother (G. S.) resided with G. S.'s father (P. S.) at the time of Jane's birth, and G. S. planned to continue living with her father.

During the time Jane was in the hospital, the records of the hospital medical social service reveal concern on the part of the hospital staff as to the care Jane would receive when released from the hospital be-

cause of the attitude of the mother, G. S. That attitude included a reluctance on the part of the mother to feed or handle Jane or change her diapers; statements that the baby looked like the father and she hated the father; that she wished the baby were a boy; and that the baby was laughing at her. G. S. was released from the hospital earlier than Jane, and the hospital staff had asked G. S. to return to the hospital to learn to properly care for Jane. The records reveal that the hospital staff informed G. S. and her father, P. S., that they were very concerned about sending the baby home because G. S. had not "been responding the way we like to see and she has not really spent that much time" with Jane. The records also reveal that the staff had talked with the attending doctors about filing a child-neglect report, but that the doctors felt that since the City had been verbally notified, that was adequate for the present. The reference to the City's being notified apparently means the City Nursing Service was notified. The hospital had also notified the Cass County Social Service Board concerning the matter. G. S. was notified that a public health nurse would visit her daily and review child care with her and that the social worker from Cass County and the hospital personnel would be available to answer any questions she might have. Arrangements were made through the Red Cross Volunteer Program to provide rides for G. S. to the hospital so that she could visit Jane. On two occasions, Red Cross volunteer workers went to G. S.'s home to give her a ride to the hospital, but G. S. declined the ride and did not go to the hospital.

Toward the end of June, 1977, G. S. had an argument with her father, P. S., left his home, and moved into the home of Phyllis LaFrombois. At that time a total of eight people lived in the two-bedroom apartment of Mrs. LaFrombois.

P. S. testified that while G. S. was living in his home he became concerned that she was not changing Jane's diapers often enough, that he did not help care for Jane because G. S. wanted to do it herself, that the bedroom where G. S. and Jane stayed was messy, and that G. S. washed clothes once during the time she was home with Jane. There was evidence that G. S. tended to stay out late at night with Jane, and also evidence of a history of difficulties between G. S. and P. S., and that when P. S. became drunk he beat G. S. and called her bad names.

The petition in this instance, however, was precipitated by certain events which took place on July 14, 1977. At that time Shelly Monson, the same age as G. S., was to babysit Jane and picked her up at about 3 p. m. from the LaFrombois residence. Shelly was informed by Mrs. LaFrombois and G. S. about a diaper rash that Jane had and was instructed on the medication for it. She also was instructed on feeding. Shelly took Jane to a baby shower at a friend's house and testified that, while there, Jane had been throwing up, developed diarrhea, started shaking and "quitting breathing," and had a 103-degree temperature. Shelly took Jane to St. Luke's Hospital, but was directed to Dakota Hospital because Jane had been born at Dakota Hospital. Shelly indicated to the medical personnel at Dakota Hospital that she was concerned by what appeared to be a bruise in the area of Jane's "tailbone." The doctor who first saw Jane at Dakota Hospital also was concerned and questioned Shelly about the bruise. The doctor was informed by Shelly that she had observed the mother handle the baby roughly.

Subsequently, Jane was seen by her pediatrician, Dr. Thomas W. Mausbach. A one-centimeter umbilical hernia was noted in the abdomen. Diaper rash was noted. The rectal temperature was normal, Jane was not in acute distress, and she moved her extremities well and equally. Her back was normal and there was no evidence of bruises on her skin. A mongoloid spot in the coccygeal area was noted and a right inguinal hernia was noted. An X-ray report revealed no fractures.

The Report of Child Abuse or Neglect signed by Dr. Mausbach on July 15, 1977, stated:

"This 2½ month old baby was brought into the Emergency Room at Dakota Hospital on 7–15–77 by Shelly Monson, a friend of the baby's mother. She indicated her concern about the care this child was receiving from her mother. [Jane] was admitted at this time.. The Grandfather, [P. S.], also contacted the Hospital on this same date, with similar complaints about care child is receiving. For these reasons, I feel the possibility of neglect of this child needs to be investigated."

■ The petition to have Jane declared a deprived child was filed the same day, June 15, 1977.[1] Also on that day, the judge of the juvenile court issued a temporary order based on the affidavit of Kay LeClerc, director of social services at Dakota Hospital, placing Jane in the temporary custody of the County Director of the Cass County Social Service Board. The petition was referred by the juvenile judge to Maurice Garrison, Juvenile Supervisor, as referee, who held a hearing on July 20, 1977, and recommended that the temporary order placing custody of Jane in the Cass County Social Service Board Director remain in full force and effect until a hearing could be had on the petition. The juvenile judge

confirmed those findings and recommendations and on that same day, July 20, 1977, the juvenile judge referred the matter for a hearing on the merits of the petition to Arthur H. Lieb, Juvenile Supervisor, as referee, pursuant to Section 27–20–07, N.D. C.C.

The hearing on the merits was scheduled before the referee on July 25, 1977, and was finally completed, with respect to the deprivation portion of the hearing, on August 3, 1977. At that time, the referee concluded that there was clear and convincing evidence to show that Jane was a deprived child. A hearing on the matter of disposition of Jane's custody was held on August 16, 1977, and on that date the findings and recommendations of the referee were issued, finding that Jane was a deprived child and recommending that she be placed in the custody of the County Director of the Cass County Social Service Board for a period of two years. The juvenile court reviewed the findings and recommendations and confirmed them on August 16, 1977. G. S. requested, pursuant to Section 27–20–07(5), N.D.C.C., a review of the findings and recommendations made by the juvenile referee, and on January 30, 1978, the court is-

1. The petition in this instance alleged that Jane was born on May 6, 1977, and resided at a certain address in Fargo, North Dakota, and alleged that G. S. had custody of the child. The petition further alleged:

"That the particular facts, circumstances, and conditions which bring said child under the jurisdiction of this Court are as follows: That the said child is alleged to be a deprived child in that the said child is without the proper care, control, subsistence, education as required by law, or other [care] or control necessary for her physical, mental, or emotional health or morals and the deprivation is not due primarily to the lack of financial means of the said parents of the said child, within the meaning of Section 27–20–02 of the North Dakota Century Code as amended.

"That your petitioner believes that said child is in need of treatment or rehabilitation and that it is for the best interests of said child and of the public that a proceeding be brought and that a further investigation be had of said matter, that a hearing be had, and that a determination be made concerning the care, custody, and control of said child as provided by law."

In *In Interest of T. M. M.,* 267 N.W.2d 807, 813 (N.D.1978), this court observed that a petition in the language of the statute defining a "deprived child" [27–20–02(5)(a), N.D.C.C.] is conclusory language that does not comply with Section 27–20–21, which requires that a petition "set forth plainly: . . . The facts which bring the child within the jurisdiction of the court, . . . " We indicated that such facts are necessary in order to provide notice to respondents so they may prepare for the hearing and participate meaningfully in it.

The petition in this case is in the language of the statute, does not indicate the particular facts which bring the child within the jurisdiction of the courts, and does not meet the requirements of Section 27–20–21. However, the appellant, G. S., has not raised this as an issue and we assume her attorney had some other knowledge of the particular allegations which permitted him to participate meaningfully in the hearing. Nevertheless, petitioners should be aware that a petition which merely recites the language of the statute in alleging a child as deprived is not sufficient.

sued its order reconfirming the referee's findings of fact and recommendations.[2]

The mother, G. S., has, pursuant to Section 27–20–56, N.D.C.C., appealed from the order reconfirming the referee's findings of fact and recommendations, and has set forth the following issues on appeal:

1. Whether the court erred in its finding that Jane is a deprived child.

2. Whether the court erred in its finding and order that Jane be removed from the custody of her mother, appellant G. S., and placed in the custody of the Director of the Cass County Social Service Board for a period of two years.

Section 27–20–02(5)(a), N.D.C.C., defines a "deprived child" as one who:

"Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of his parents, guardian, or other custodian; . . . "

 A summary of our previous decisions construing this section is found in *In Interest of L. R. S.,* 271 N.W.2d 562 (N.D. 1978). That decision and other cases referred to therein indicate:

1. The term "proper care," as used in Section 27–20–02(5)(a), N.D.C.C., means that the parents' conduct in raising their children must satisfy the minimum standards of care which the community will tolerate.

2. Evidence that compares the child-rearing skills of the natural parents with those of the foster parents will not alone support a finding of deprivation if the parents' efforts meet the minimum standards of care.

3. Lack of cleanliness of the home does not alone establish deprivation.

4. The finding of poverty or lack of education or culture is not sufficient to establish deprivation.

5. Parents have a constitutional right to the custody and companionship of their children, but this right is not absolute and parents are not entitled to the custody of their children under all circumstances.

6. Parents are entitled to a presumption that they are fit parents, and the burden of disproving this presumption of parental fitness is on the challenger.

7. Deprivation must be shown by clear and convincing evidence.

In addition, we have indicated reluctance to remove a child from the parents unless "diligent effort has been made to avoid such separation," and unless it is necessary to prevent serious detriment to the welfare of the child. *Bjerke v. D. T.,* 248 N.W.2d 808, 814 (N.D.1976), quoting *In re Klugman,* 256 Minn. 113, 97 N.W.2d 425, 429 (1959). We have also indicated that we are aware of the argument that it is dangerous to allow social workers to determine how a family is run. *Bjerke, supra,* 248 N.W.2d at 814.

 The review by the juvenile court of the findings and recommendation of the referee is governed by Section 27–20–07, N.D.C.C., and Rule 53, N.D.R.Civ.P. Rule 53(e)(2) provides that in an action to be tried without a jury the court shall accept the findings of fact unless clearly erroneous. The scope of review of this court, however, is broader than the "clearly erroneous" rule of Rule 52(a), N.D.R.Civ.P. Thus Section 27–20–56(1), N.D.C.C., provides, in part:

"1. . . . The appeal shall be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court."

---

2. The long interval between the time of the request for review and the judge's order reconfirming the findings and recommendations is, according to the brief of counsel for the appellant, G. S., due to the fact that the record of the hearing was made by tape recorder and the tapes had to be transcribed for review by the juvenile judge. We are also informed by counsel that at present testimony in hearings before the juvenile referee is being transcribed by a court reporter.

We are allowed to re-examine the evidence in a manner comparable to the former trial de novo. See *In the Interest of L. R. S., supra.*

The primary issue for this court to determine is whether Jane is a deprived child pursuant to Section 27–20–02(5)(a), N.D. C.C. The mother, G. S., alleges that the juvenile court erred in its finding that Jane is a deprived child.

The pertinent findings in that regard are set forth in paragraphs IV, V, and VI of the findings and recommendation of the juvenile referee. We quote them for the purpose of determining whether they are supported by clear and convincing evidence:

## "IV.

"That the child, . . . was born a premature child and was kept in intensive care at Dakota Hospital for about five weeks after her birth. That the mother of the child was discharged from the hospital about four days after the child's birth. That the mother did not show adequate concern for the child, nor did she cooperate with hospital authorities in learning to properly care for the child, and on two occasions, though the Red Cross provided drivers to transport her to the hospital, she refused to go to the hospital. That the said mother made comments to hospital authorities concerning her lack of interest in the child and seemed to be resistive at times to even feeding or changing the diapers of the child, while the child was in the hospital. That a witness described [G.S.'s] handling of the child, . . . as being rough, of scrubbing the child too hard while washing her, and of, on one occasion, dropping the child on a hassock. That the mother of the child became angry at her friends to whom she entrusted the child when those friends took the child to the hospital after the child displayed irregular breathing and had diarrhea. That the mother of the said child opposed the hospitalization of the said child on July 15, 1977, as it was unnecessary in spite of the fact that the doctor kept the child in the hospital rather than releasing her after examination. That T. W. Mausbach, M.D.'s impressions were, (1) Possible child neglect; (2) Premature female infant now two months of age; (3) Marked diaper rash, irritative contact dermatitis; (4) Shaking spells; (5) Diarrhea; (6) Umbilical hernia; and (7) Right inguinal hernia. That the mother's treatment of the child has been described as being rough and inadequate.

## "V.

"That the usual support lines which parents have do not appear to be available to [G. S.]. That her mother is deceased. That she has no husband. That, according to her own testimony, she does not get along well with her father, [P. S.]; and that [G. S.] and [P. S.] displayed considerable animosity toward one another during the accusatory phase of the within hearing. That testimony indicated that [P. S.] has beaten the said [G. S.]. That while [G. S.] had indicated to hospital staff that [P. S.] would assist her in the care of [Jane], she moved out of her father's house shortly after the child came home from the hospital after her father pushed her head against a door and kicked her in the kidneys; while according to [P. S.'s] version of the incident, he grabbed her by the hair and slapped her twice with his hand. That the child, [Jane], received what is described as a cigarette burn on her left leg. That [P. S.] and [G. S.] blamed each other for inflicting the burn.

## "VI.

"That the said [G. S.] has testified that she would not cooperate with Cass County Social Services workers and further indicated she has resistance to public health nurses visiting with her in her home or supervising her care of the child. She testified that if the child were returned to her she would immediately leave the area, thus removing the child [Jane], from the jurisdiction of the Court

and from the likelihood of any kind of supervision by the Court, Social Services, or health authorities."

Based on these findings, the juvenile referee found in paragraph VII of the findings and recommendation that Jane is a deprived child, under Chapter 27–20, N.D.C.C., and that a continuation of Jane in the home of her parent would be contrary to her welfare.

▮ G. S. argues that this court cannot logically give any "appreciable weight" to a finding of a lower court that is based on evidence insufficient under the law, and further argues that the sole question is whether the evidence is sufficient under the law to find that Jane is a deprived child. G. S. also notes that she is not aware of what standard of proof is meant by the words "clear and convincing," but argues that it would be a greater burden of proof than that required in an ordinary civil case, i. e., preponderance of the evidence. We believe that in requiring this court to determine whether the findings are supported by "clear and convincing evidence" and in requiring this court to give "appreciable weight" to the findings of the lower court, the Legislature intended that we review the facts anew but also intended that we recognize that the lower court had the opportunity to observe the candor and demeanor of the witnesses while they were testifying. Cold words on a printed page of a transcript may carry a different impact from the same words spoken by a witness under oath on the witness stand.

▮ In reviewing the evidence adduced to support the findings in this instance, we cannot conclude that all of the findings are supported by clear and convincing evidence. An examination of the testimony and exhibits clearly reveals that the umbilical hernia and the right inguinal hernia which the doctors found to be present were not the result of abuse by the mother but rather were present at birth. Further, it is apparent that the bruise on the "tailbone" was not caused by G. S.'s dropping Jane, as was inferred, but rather was a mongoloid spot on the coccygeal area which had also been present at birth. There is no doubt that Jane had diaper rash and diarrhea at the time she was admitted to the hospital. However, the record also shows that G. S. was treating the baby for the diaper rash and there is no indication that she was aware of the diarrhea since Jane was in the care of a babysitter at the time it developed. The parents of children in this State would be more than surprised to find that their children could be declared "deprived children" and removed from their custody if they developed diaper rash or diarrhea.

It is apparent that a series of events involving Jane's diaper rash, diarrhea, and the statements made by Shelly Monson, a girl approximately the same age as G. S., to the hospital staff at the time of Jane's admittance on July 15, 1977, caused the doctor to file the report of possible child abuse and neglect. It is not strange that the report was filed. However, many of the circumstances which might have led the doctor to file the report were adequately explained during the hearing before the juvenile referee and are not sufficient to establish deprivation.

It also appears that a part of the reason for this proceeding might have been the opposition of G. S. to receiving instruction on the proper care of Jane from the various public agencies including the hospital personnel, public health nurses, and social workers. We do not believe that is an adequate reason to declare Jane a deprived child, although we recognize it as a factor in the overall attitude of G. S. toward the care of Jane.

There was also testimony that dirty diapers were scattered about the room in the house of P. S. which G. S. occupied while she was living in that house;[3] testimony that sour formula was fed to Jane; and testimony that G. S. handled Jane in a rough manner. There was also testimony

3. Lack of cleanliness of the home alone does not establish deprivation. *In Interest of R. H.,* 262 N.W.2d 719 (N.D.1978); *In re Kelber,* 51 N.D. 698, 709, 200 N.W. 786, 789 (1924).

of a cigarette burn to Jane, but it is far from clear in the evidence whether that burn did, in fact, exist, and, if it did, who was responsible for causing the burn. The record also indicates a feeling of animosity between G. S. and her father, P. S., prior to and at the hearing on deprivation but which apparently had dissipated by the time of the hearing on disposition on August 16, 1977.

While much of the evidence is not clear and convincing as to many of the detailed matters that are relied upon by the juvenile court in concluding that Jane is a deprived child, there are two considerations that together, when the evidence is considered cumulatively establish deprivation:

1. Jane is a premature child in need of special care.

2. G. S. has shown less than adequate concern for Jane and is resistant to efforts made to improve her skills and knowledge in properly caring for Jane.

With respect to the first consideration, we do not believe this is necessarily a continuing matter since the evidence does not indicate that Jane suffers from any lasting disabilities due to her premature birth. The second factor may, at least in part, be explained by the fact that G. S. was immature at the time of Jane's birth and had no husband, no mother, and no family background to assist her in developing the needed skills. Neither do we believe this is necessarily a continuing factor since G. S. as she matures may develop the needed skills to properly care for Jane, at least the basic skills needed to properly care for her if she develops from her premature status to a normal child. "Proper care," as used in Section 27–20–02(5)(a), N.D.C.C., has been interpreted by this court to mean that the parents' conduct in raising their children must satisfy the "'minimum standards of care which the community will tolerate.'" See *In Interest of K. P.*, 267 N.W.2d 1, 3 (N.D.1978); *In Interest of R. H.*, 262 N.W.2d 719, 724 (N.D.1978).

■ If this were a matter involving the termination of parental rights we would not hesitate to conclude there is no clear and convincing evidence that the causes and conditions of deprivation are likely to continue or will not be remedied. That is a necessary element in termination of parental rights. See *In Interest of R. H., supra.* Because the order placing Jane's custody in the Cass County Social Service Director is for the limited period of two years, and thus is not a termination of parental rights but is an order subject to continuing review, we affirm the order of the juvenile court holding Jane to be a deprived child. See *In the Interest of L. R. S., supra.*

■ We have concluded that the juvenile court's order finding Jane to be a deprived child should be affirmed, and we now consider the second question raised by G. S., i. e., whether the juvenile court erred in its finding and recommendation that Jane be removed from the custody of her mother, G. S., and placed in the custody of the Director of the Cass County Social Service Board for a period of two years.

G. S. argues, with some force, that in construing Section 27–20–30(1),[4] N.D.C.C.,

---

4. "27–20–30. Disposition of deprived child.—

"1. If the child is found to be a deprived child the court may make any of the following orders of disposition best suited to the protection and physical, mental, and moral welfare of the child:

"a. Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child;

"b. Subject to conditions and limitations as the court prescribes, transfer temporary legal custody to any of the following:

"(1) Any individual who, after study by the juvenile supervisor or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child;

"(2) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child;

"(3) The director of the county welfare board or other public agency authorized by law to receive and provide care for the child;

"(4) An individual in another state with or without· supervision by an appropriate officer under section 27–20–40; or

providing for the disposition of a deprived child, there should be a presumption that parents are entitled to custody of their child, and that there should be a grave reason required before removing a child from the parents' custody. This court has previously so held. See, e. g., *Bjerke v. D. T., supra.* There is no doubt that the juvenile court had the authority to declare Jane to be a deprived child and to permit her to remain with G. S. subject to conditions, limitations, and supervision as the court might prescribe for her protection, but G. S. announced that if she regained custody of Jane she would remove her from the jurisdiction of the court. P. S., the father of G. S., had already moved from the State at the time of the hearing on the disposition of Jane. To conclude that the juvenile court could find Jane to be a deprived child but that the court should have placed custody with G. S. under conditions supervised by the court would be inconsistent in view of the testimony of G. S. that she would remove Jane from the jurisdiction of the court. While we hope that in most instances the deprived child could remain with the parents under conditions and supervision of the juvenile court, that may not be possible in all instances. We cannot conclude that the juvenile court erred in not permitting Jane to remain with G. S. during the effect of this order. We also note, however, that the finding that Jane is a deprived child is a very close question in this instance and the juvenile court should be alert to a change in conditions if a request for the extension of the order be presented to it.

Affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

---

"c. Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state if authorized by and in accordance with section 27–20–39 if the child is or is about to become a resident of that state.

