246 N.W.2d 892 (1976)
In the Interest [CUSTODY] OF D.G., a child.
Mrs. J.S. [E.S.], Petitioner and Appellant,
v.
K. G., Respondent, and
R.G. and V.G., Respondents and Appellees.
In the Matter of Petition for ADOPTION OF D.G., a child, and Termination of Parental Rights of R.G. and K.G.
J.S. and E.S., Petitioners and Appellants,
v.
Reuben E. CARLSON, as Administrator of the Division of Child Welfare of the Public Welfare Board [Social Service Board] of the State of North Dakota, and K.G., Respondents, and
R.G., Respondent and Appellee.
Civ. Nos. 9232, 9233.
Supreme Court of North Dakota.
November 19, 1976.
*893 Daniel J. Chapman, Bismarck, for J.S. and E.S.
Alfred C. Schultz of Sperry & Schultz, Bismarck, for R.G. and V.G.
Patrick S. O'Neil, Mandan, for D.G., a Child.
Wayne J. Anderson, Sp. Asst. Atty. Gen., Bismarck, for Social Service Bd. of State of N.D.
VOGEL, Justice.
This is an appeal from an order of the juvenile court awarding custody of the minor child, D.G., to his father, R.G., and denying the petition of the child's maternal grandparents for adoption. We affirm as to the adoption and reverse as to the custody.
The child's parents, R.G. and K.G., were married in 1970. He was born on 19 January 1971. Since his birth, he has lived with the grandparents, J.S. and E.S.
In January 1972, the child's father left the community and did not see his son again until the fall of 1975. In April of 1973, the parents were divorced and the custody of the child was awarded to the mother. The father was ordered to make child-support payments to the mother. He made three monthly support payments and then stopped paying. At this time, he was employed in Minneapolis and turning his *894 finances over to a credit agency which arranged for payment of his other bills, but not his support obligation.
During this time, the child was residing with and was supported by his maternal grandparents. His mother also resided with her parents except for the times when she was hospitalized. She has a history of severe mental problems and emotional disturbances.
The grandparents had temporary custody, by court order, at the time of their petitions. They petitioned the court for an award of permanent custody. They also petitioned the court to terminate parental rights and for the adoption of the child by them.
The father, now remarried and making his home in Wilton, North Dakota, petitioned the court for a change in custody to him. His wife joined in the petition.
In a consolidated hearing, the juvenile court found that D.G. was a deprived child, and, in relation to his mother, that such deprivation was likely to continue, and therefore terminated the mother's parental rights. The court did not terminate the father's parental rights, finding that the deprivation in relation to the father was not likely to continue. The court therefore denied the grandparents' petition for adoption and granted custody to the father and his wife, with conditions. The conditions imposed upon this custody award included the requirement that the child attend certain stimulation programs offered by county Social Services.
The child is below the normal achievement level for children of his age, and has a speech impediment. He was born with a cleft lip which was corrected surgically when he was seven weeks old.
A homemaker from the county Social Services agency was assigned to the grandparents' home for several years. Her main function was to assist the mother in homemaking and child care and to provide stimulation for the child. This homemaker, together with her supervisor and a social worker, recommended that the child attend certain county programs designed to aid child development and stimulation. Social Services discussed these programs with the grandparents, stressing the importance of the child's attendance. He attended these programs less than 50 percent of the time.
The trial court found that the child's home with the grandparents was one of security, love, and affection. It also found that the grandparents appeared to be over-protective of him, that the stimulation they gave him was less than adequate, and that they were inconsistent in following professional advice about his underdevelopment.
The court also found that although the natural father had not been the best of fathers in the past, there was promise that he and his wife could make a home for the child in the future. It was for this reason that the father's parental rights were not terminated and that the grandparents' petition for adoption was denied. We agree with that determination by the lower court. We also agree with the court's termination of the mother's parental rights.
Once the preliminary finding of deprivation was made [see In Interest of M.L., 239 N.W.2d 289 (N.D.1976)], the issue then becomes one of custody between the natural father and the maternal grandparents. It is on this point that we reverse the lower court.
The lower court's transfer of custody was an exercise of its power under the Uniform Juvenile Court Act, Chapter 27-20, N.D.C.C. The appellate court's scope of review under that Act is broader than the scope of review authorized by Rule 52(a), N.D.R.Civ.P. Rule 81(a), N.D.R.Civ.P., exempts the Uniform Juvenile Court Act from Rule 52(a). Section 27-20-56, subsection 1, of the juvenile court Act authorizes review much like the former trial de novo. Therefore, we are not bound by the "clearly erroneous" rule in our examination of the lower court's decision. In Interest of M.L., supra; In re A.N., 201 N.W.2d 118 (N.D. 1972).
*895 The test to be applied in a custody determination is usually described as the "best interests of the child" test. Matson v. Matson, 226 N.W.2d 659 (N.D.1975); Silseth v. Levang, 214 N.W.2d 361 (N.D.1974); Adams v. Adams, 198 N.W.2d 118 (N.D.1972). While the cases cited involve custody issues under the divorce statutes, the Uniform Juvenile Court Act employs the same concept. Section 27-20-30, N.D.C.C., empowers the court to award custody when such an award is "best suited to the protection and physical, mental, and moral welfare of the child."
Whatever the language, the concept of "best interests" means that the court will look primarily to the child's welfare and place the child where his or her welfare will be best promoted. Once the child has been in the custody of a party, that custody will be changed only upon a showing that such a change is necessary to protect and promote the child's welfare. Silseth v. Levang, supra.
In the instant case, the child has lived with his grandparents for his entire life. (The transfer of custody ordered by the juvenile court was stayed during the pendency of this appeal.) He is loved there and cared for there. He and his grandfather enjoy a father-son relationship. It is the only home he has ever known, and the grandparents are the persons to whom he turns for help and reassurance.
On the other hand, the child hardly knows his father and does not consider him to be his father. And the father admits to never having kissed the child or shown him any affection. It is no doubt true that the father, with his present wife, is more settled than he was when he left his son. We do not feel, however, that this potential for a good family life is enough to offset the detrimental effects of a change in custody on the child.
Continuity in a child's life, especially a young child, is one of the most important factors in determining that child's best interests. This point is well explained in Beyond the Best Interests of the Child by Freud, Goldstein, and Solnit [New York: The Free Press (1973)], a book discussed in both the majority opinion and the special concurrence in Jordana v. Corley, 220 N.W.2d 515 (N.D.1974). The authors point out that the greatest influence on a child comes from that person or persons the child is used to, fond of, and connected with by experiences, memories, and identification. That person becomes the child's psychological parent in whose care the child feels valued and wanted. With every change in this parent figure, the child's development may regress.
In this case, continuity in the child's life can be preserved by maintaining custody with the grandparents. The advantages to the child by avoiding uprooting him outweigh the somewhat minor problems the lower court found with the grandparents. Those problems were the difference in age between grandparents and child, the alleged overprotectiveness of the grandparents, and their inconsistency in following professional advice.
We do not feel that their age or their overprotective tendency is of major concern here. The grandmother is 46 now, and the grandfather is 52. They are not too old to raise a six-year-old boy. Indeed, they are not too old to be the natural parents of a six-year-old. In addition, their alleged overprotectiveness is not enough to compel a change in custody. We are not in a position to say that every overprotective parent (natural or otherwise) should have his or her child taken away. As D.G. attends school, his relationships with his classmates and his experiences in a school situation will work to eliminate this tendency on the part of the grandparents to be overprotective.
We feel that the grandparents' inconsistency in following professional advice can be remedied by imposing conditions on the custody awarded to them, similar to those imposed on the custody awarded to the natural father by the trial court.
*896 We conclude that the trial court's termination of the mother's parental rights, the refusal to terminate the father's parental rights, and the consequent denial of the grandparents' petition for adoption should be, and they are, affirmed.
The trial court's transfer of custody to the father and denial of custody to the grandparents is reversed and the case is remanded, with permanent custody to be granted to the grandparents. Upon remand, the juvenile court may impose conditions on the custody order similar to those formerly ordered as to the father's custody.
ERICKSTAD, C.J., and PEDERSON, PAULSON and SAND, JJ., concur.