Robert R. EASTBURN, Petitioner and Appellee,

v.

B.E., Mother, Respondent and Appellant,

A.E., A.E., C.D., B.J.D., D.E., Father of A.E. and A.E., and J.P.D., Father of C.D. and B.J.D., Respondents.

Civil No. 950303.

Supreme Court of North Dakota.

April 3, 1996.

Carol Susag Nelson of Nelson Law Office, Valley City, for respondent and appellant.

Robin Huseby, State's Attorney, Valley City, for petitioner and appellee.

NEUMANN, Justice.

B.E. ("Betty")[1] appeals from a juvenile court order continuing Barnes County Social Services' care, custody, and control of Betty's daughters A.E. ("Alice") and A.E. ("Anne") for eighteen months. We affirm.

Betty married D.E. ("Dennis") in 1985. Their daughter Alice was born in 1987, and their daughter Anne was born in 1989. In 1990, Betty and Dennis separated. Betty then joined the carnival. Betty's mother and Dennis cared for Alice and Anne while Betty was away. After returning to North Dakota, Betty was admitted to the State Hospital and treated for alcoholism and depression. In 1991, the juvenile court took jurisdiction of Alice and Anne and placed them in foster care. Shortly afterward, they were placed in the physical custody of their great-aunt and uncle.

In late 1991, Alice and Anne were placed in the custody of their grandfather in Washington state. Betty regained custody in 1992. She and her children then moved to Florida with J.P.D. ("John"). John and Betty then had a child, C.D. ("Chad"), who was born in 1992.

In 1993, Betty returned to North Dakota with Alice and Anne. She left them with Dennis and returned to Florida. Later, she came back to North Dakota with John. John and Betty had a second child, B.J.D. ("Brett"), who was born in 1993. By the end of 1993, Betty, John, Alice, Anne, Chad, and Brett were living together in North Dakota.

The current action began when Anne was removed from Betty's physical custody and placed in the custody of Barnes County Social Services on July 28, 1994, after making sexual abuse allegations against John. Alice also was removed from Betty's physical cus-

tody and placed in the custody of Social Services on September 20, 1994. A hearing was held and on October 17, 1994, the juvenile court issued an order removing Alice, Anne, Chad, and Brett from the custody and control of their parents. The juvenile court gave custody of the children to Social Services for six months, with Alice and Anne to be in foster care and Chad and Brett to remain with Betty under Social Services' supervision.

Alice and Anne were again placed with their great-aunt and uncle as foster parents. The court ordered that Dennis be allowed day visits with the children with a possibility of weekend visits. Betty was allowed day visits with a possibility of overnight visits. The court ordered that John not be present for the visits with Betty.

Another hearing was held and on March 31, 1995, the juvenile court issued an order extending Social Services' custody of Alice and Anne until June 1995, when the children were to be reunited with Betty. The order allowed weekend visits by Betty and ordered that Social Services attempt to make John a part of these visits.

Betty announced she planned to move from North Dakota to Washington state at some point before the March 1995 order expired. The State then moved for an extension of custody in favor of Social Services. The juvenile court held a hearing in June 1995 and issued the order appealed from here. The court found, among other things:

> "That [Alice and Anne] are presently deprived, and that they are in an extremely risky situation with respect to their psychological and emotional needs, and need a lengthy period of stability, up to two years, to address those needs, and at this time the Court is not satisfied that [Betty] can meet the needs of those two girls sufficiently to assure that their problems will be dealt with appropriately."

The court therefore ordered that Alice and Anne remain in the "care, custody and control" of Social Services, in foster care, for an additional eighteen months. Betty appeals.

---

1. All party names are pseudonyms.

Betty first argues the juvenile court erred in concluding that Alice and Anne continued to be deprived as of the June hearing.

■ When a party appeals a juvenile court order issued under the Uniform Juvenile Court Act, chapter 27–20, N.D.C.C., we review "the files, records, and minutes or transcript of the evidence" and we give "appreciable weight to the findings" of the court. N.D.C.C. § 27–20–56(1); *see In Interest of D.G.*, 246 N.W.2d 892, 894 (N.D.1976). "Our review is not limited to a determination of whether or not the juvenile court's findings are clearly erroneous, but rather we are allowed to reexamine the evidence in a manner similar to the former procedure of trial de novo." *In Interest of J.K.S.*, 321 N.W.2d 491, 492–93 (N.D.1982). We give some deference to the juvenile court's decision, however, because it had the opportunity to observe the candor and demeanor of the witnesses. *In Interest of N.W.*, 510 N.W.2d 580–81 (N.D. 1994).

■ A juvenile court may extend a disposition order if:

"a. A hearing is held prior to the expiration of the order upon motion of a party or on the court's own motion;

b. Reasonable notice of the hearing and opportunity to be heard are given to the parties affected;

c. The court finds that the extension is necessary to accomplish the purposes of the order extended; and

d. The extension does not exceed eighteen months from the expiration of an order limited by subsection 3 or two years from the expiration of any other limited order." N.D.C.C. § 27–20–36(4).

In addition, before extending a disposition order, the juvenile court must find that the child remains "deprived" as defined by section 27–20–02(5), N.D.C.C., because the court would lack jurisdiction over the child under section 27–20–03(1)(a), N.D.C.C., without such a finding. *J.K.S.*, 321 N.W.2d at 493.

■ Section 27–20–02(5) instructs that a "deprived child" is one who:

"a. Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian."

Clear and convincing evidence must support a finding of deprivation. *N.W.*, 510 N.W.2d at 581.

■ It is apparent from the juvenile court's August 23, 1995, findings of fact, conclusions of law and order for continuation of custody that the court found Alice and Anne to be deprived based on their "tumultuous" past lives, their current psychological problems, and Betty's continuing instability and impulsiveness. Upon review of the record, we agree there is clear and convincing evidence that Alice and Anne continue to be deprived.

The juvenile court observed in its order continuing custody that "[t]he order in this matter was due to expire on June 1, 1995, and [Betty] was to regain physical custody." This disposition was planned based on evidence that Betty had her life on track and was establishing a stable home in North Dakota. Evidence in the record shows that she was participating in Alcoholics Anonymous, that she was a top student in her beauty college class, and that she had participated in parent training. Betty testified at a hearing in March 1995 that she planned to work and live in Jamestown after completing beauty school. She also testified that she and John planned to marry.

Betty's situation, however, changed after the March hearing. Evidence in the record shows she was involved in a bar fight, broke up with John, dropped out of beauty school, took a whirlwind trip to Arizona, and decided to move to Washington. Betty testified during the June 1995 hearing that most of these events came about because of her break-up with John. She also explained she wanted to move to Washington because she could attend a better beauty college and because she would have access to more support from her

family there. Upon review of the evidence and testimony, the trial court concluded:

> "While [Betty] made strides toward stability in her life from the fall of 1994 to March of 1995, she has reverted back to some of the same patterns of instability she has exhibited since first contacts with the court system regarding [Alice and Anne] in 1991. Her impulsivity seems to be more of a characteristic of hers than does stability . . . ."

Evidence in the record shows Alice and Anne had continuing psychological and emotional problems at the time of the June 1995 hearing. Dr. Dwight Lysne, a board certified child psychologist, evaluated and treated the children. In December 1994, he reported the children had developed problems because of the "chronic chaos and instability" they had experienced in their lives. Specifically, he reported both children were "anxious, fearful . . . angry, and at times depressed" and that they had "nightmares and sleeping problems." He reported that both displayed elements of post traumatic stress disorder. He also reported that Alice suffered from "a chronic form of depression" and Anne showed signs of Attention Deficit Hyperactivity Syndrome. He characterized the children as under "extreme psychosocial distress." Dr. Lysne reported that the children needed a "consistent, loving, safe, and predictable environment" and "continued psychological counseling" to help them recover from their psychological problems. At the June hearing, Dr. Lysne testified that the children continued to suffer from psychological problems, and that they needed stability and predictability in their lives.

Kathleen Miller served as guardian ad litem for Alice and Anne. She first had contact with the family in 1991. She investigated before the March 1995 hearing and submitted a report in February 1995. She recommended that Alice and Anne be returned to Betty in June 1995, subject to a series of conditions. Specifically, she recommended that Alice and Anne continue to work with Dr. Lysne and she stated that "[i]t is imperative their counselor not be changed." In addition, she recommended that Betty be required to "remain within a radius of 150 miles of Valley City so supervision [can] be consistent" for a year after placement of the children with her. In concluding her report, she observed that "[t]hese children have lived in turmoil and instability all their lives."

Miller submitted a follow-up report in March 1995. In it, she observed that Betty had an "inability to make her children . . . a high priority." She also reported that Alice and Anne had not experienced "stability, safety and an adult commitment" while in Betty's care. At the June 1995 hearing, Miller testified the children continued to need stability in their home and that this stability did not exist in Betty's home.

Evidence in the record shows Betty was consistently unable to give the children a stable home, that instability was and continued to be one of Betty's major characteristics at the time of the June 1995 hearing, that the children were suffering serious psychological and emotional problems, and that it was unlikely that Betty could provide the stable and consistent environment the children needed to recover from their psychological problems. Upon review of the record, we conclude that clear and convincing evidence shows that, at the time of the June 1995 hearing, Alice and Anne were "deprived" under the definition provided in section 27–20–02(5), N.D.C.C., because they were without the "care or control necessary" for their "physical, mental, or emotional health."

Betty also argues the juvenile court erred in concluding it would be in the best interests of the children to remain in foster care. Section 27–20–30(1), N.D.C.C., allows the juvenile court, when it finds that a child is deprived, to make a disposition order "best suited to the protection and physical, mental, and moral welfare of the child." In making its disposition, the court is to "look primarily to the child's welfare and place the child where his or her welfare will be best promoted." *D.G.*, 246 N.W.2d at 895. We review juvenile court decisions regarding what disposition is in the "best interests" of the child under the same broad standard of review we apply to other juvenile court actions under the Uniform Juvenile Court Act. *Id.* at 894.

■ The evidence we reviewed in considering whether Alice and Anne were deprived shows that Betty has not shown herself to be able to provide the stable home the children need. On the other hand, other evidence in the record shows that the foster parents, Alice and Anne's great-aunt and uncle, have provided the stability needed by the children.

Dr. Lysne recommended in December 1994 that Alice and Anne be placed "in an environment that is meeting their needs and has a track record of the parental figures functioning stably over the last two years." He testified at the June 1995 hearing that:

"[T]he essence of what has been disrupting [Alice and Anne] in this post traumatic stress problem, [is] that they haven't had secure attachments to adults and that's the thing they do have in the current foster home setting. And I think that has been a big factor in their thriving there."

He testified that Alice and Anne had experienced "a lack of consistency in their lives and lack of safety and predictability," but that there was evidence of a "real secure attachment" currently between the children and their foster parents. He also testified that Alice and Anne were benefitting from the stable home environment in their foster home and that they needed to remain in a stable home environment for "two or three years."

Dr. Lysne testified that he would not recommend a change in physical custody for Alice and Anne unless it was to "a stable living situation" with "a stable attachment figure" and "a safe and secure home." Miller, the guardian ad litem, testified that, based on Betty's history, she would not recommend a change of physical custody to Betty until her home was stable for a year. In her June 1995 report, Miller recommended the children remain with their foster parents "for no less than one year." She indicated their foster home "has proven to be the environment in which the girls are free to be children, learn age appropriate behavior, and learn how to respect people, properties and themselves."

Because clear and convincing evidence in the record shows the "best interests" of Alice and Anne would better be served by allowing them to remain in the stable home environment provided by their foster parents rather than moving them to a historically unstable environment with Betty, we conclude the juvenile court did not err by ordering that Alice and Anne remain in foster care.

■ Betty also argues that Social Services failed to make reasonable efforts to reunite the family. In its October 1994 order, the court required that "all reasonable services or efforts be offered or considered in order to make possible the return of the children to their parental home." In arguing that this order was not followed, however, Betty ignores the fact that family reunification was planned to take place in June 1995. Miller recommended in her February report that physical custody of Alice and Anne be returned to Betty. Dr. Lysne testified at the June 1995 hearing that it was a "foregone conclusion" that Alice and Anne were going to be returned to Betty. In its August 1995 order, the juvenile court observed Betty was to have regained physical custody when the previous order expired. It is clear from the evidence in the record that the unification plan was derailed because of Betty's actions, such as abruptly quitting school and leaving town, not because Social Services or any other governmental agency failed to try to reunite the family.

The record is replete with evidence that the court and Social Services worked to reunite Betty and her children. Social Services made services and counseling available to Betty to help her deal with her personal problems. Michael Sprung of Social Services testified that, after the March 1995 hearing, visitation between Betty and the children was expanded and intensified, and Social Services integrated her fiancé John into the visitation program. Sprung also testified that they obtained visitation funding for Betty. In addition, Betty was given a parent aide and participated in the "Magic" parenting program.

Upon review of the evidence in the record, we agree with Miller that "[t]he 'system' . . . made every effort to help [Betty and Dennis] be more responsible parents." We conclude the evidence shows the juvenile court and

Social Services made reasonable efforts to reunite the family.

Betty last argues the juvenile court lost jurisdiction over this matter because time limits were not met. The record does not show Betty raised this issue before the juvenile court, and Betty admitted at oral argument that she had not raised the issue below. Furthermore, Betty was not able, in her brief or at oral argument, to show specifically which orders had expired. We have consistently stated "we do not consider questions that were not presented to the trial court and that are raised for the first time on appeal." *American State Bank and Trust Co. of Williston v. Sorenson,* 539 N.W.2d 59, 63 (N.D.1995); *In Interest of A.G.,* 506 N.W.2d 402, 403–04 (N.D.1993). We decline to consider the time limit issue here.

The juvenile court's order is affirmed.

VANDE WALLE, C.J., and SANDSTROM and MESCHKE, JJ., concur.

The Honorable MARY MUEHLEN MARING was not a member of the Court when this case was heard and did not participate in this decision.