In the Interest of E.J.H. and
T.S.H., Minor Children.

Vince AMENT, Petitioner and Appellee,

v.

E.J.H., a Minor Child, T.S.H., a Minor Child, M.H., Mother of E.J.H. and T.S.H., and B.C., Father of E.J.H., Respondents,

and

Q.P., Father of T.S.H., Respondent and Appellee,

and

L.H., Maternal Grandmother of E.J.H. and T.S.H., and L.O., Maternal Aunt of E.J.H. and T.S.H., Intervenors and Appellants,

and

D.B. and J.B., Maternal Grand Uncle and Grand Aunt of E.J.H. and T.S.H., K.O., Maternal Uncle of E.J.H. and T.S.H., and W.S. and T.S., Maternal Uncle and Aunt of E.J.H. and T.S.H., Intervenors.

Civil No. 950248.

Supreme Court of North Dakota.

April 23, 1996.

John E. Greenwood, State's Attorney, Jamestown, for petitioner and appellee Vince Ament. Submitted statement.

Joseph F. Larson II, Jamestown, for respondent and appellee Q.P.

Monty G. Mertz, Fargo, ND, for intervenors and appellants.

VANDE WALLE, Chief Justice.

This is an appeal from a trial court's custody determination placing custody of T.S.H. with her natural father. The child's maternal grandmother and extended family members appealed the trial court's order, claiming "exceptional circumstances" warrant that custody of T.S.H. be placed with them rather than with the child's natural father. Because the trial court's finding that exceptional circumstances did not exist in this case was not clearly erroneous, we affirm the trial court's order.

On January 6, 1993, Vince Ament, a juvenile supervisor for Stutsman County, filed a petition in juvenile court asserting that E.J.H. and T.S.H. were deprived children under section 27–20–02(5), NDCC, and in need of protection. The children had been living with their mother (M.H.) and B.C., believed to be the children's father. Sometime after the petition was filed, Ament became aware that Q.P., rather than B.C., might be T.S.H.'s natural father. An amended petition asserted:

> "that said children are alleged to be subject to physical abuse by [B.C.], as allegedly reported to Stutsman County Social Services by [M.H.] . . .; that the environment provided for the children by [M.H.] includes unhealthy elements wherein the children experience emotional harm, that these elements, including: threats from [B.C.], especially when intoxicated, and complaints of numerous medical needs of the children and [M.H.], are the effect of a depressive or personality disorder of the mother, not of her lack of concern or love for the children; that [Q.P.] has made no attempt to exercise any parental rights with respect to [T.S.H.]."

On November 9, 1993, the juvenile court adjudicated E.J.H. and T.S.H. deprived. The court found that the children were without proper parental care or control, "including unhealthy emotional elements from the mother and [B.C., the] need for treatment by [B.C.], and the lack of attempt by [Q.P.] to exercise parental rights." The court granted the care, custody, and control of the children to the director of the Stutsman County Social Service Board and ordered that M.H., B.C., and Q.P., be allowed visitation. Social Services placed the children in foster care with their maternal aunt and uncle, who had been caring for the children since October 13, 1993, as a result of a temporary order. On May 26, 1994, the juvenile court ordered

Social Services to continue the custody and control of the children until April 25, 1995.

■ On September 7, 1994, in a separate paternity action filed in district court, the court determined that Q.P. was T.S.H.'s natural father. In his pleadings in the paternity suit, Q.P. sought custody of his daughter. Notice of a custody hearing relating to the paternity action was filed in juvenile court.[1] The children's maternal grandmother and extended family, including the aunt and uncle providing foster care, moved to intervene, and petitioned for joint legal custody of the girls. Because the aunt and uncle were not in the position to continue providing a home for the children, the intervenors requested that physical custody be placed with the grandmother. The court granted the motion to intervene and stated that it would reconsider its disposition of May 26, 1994. In addition, the court ordered that it would determine the custody issue as part of the juvenile court proceedings, and combined all actions relating to the custody or welfare of the children with the juvenile court proceedings.[2]

After a hearing, the court found that, due to their health problems, M.H. and B.C. were unable to care for E.J.H. Considering E.J.H.'s best interests, the court awarded custody of E.J.H. to the intervenors and granted physical custody to the grandmother. The court's custody determination for E.J.H. was not appealed and is not an issue before us.

The court similarly denied custody of T.S.H. to M.H. But, unlike the situation with E.J.H., the court determined that Q.P. did not have any mental or physical disabilities that would make it impossible for him to care for his child. The court awarded custody of T.S.H. to Q.P. after determining that exceptional circumstances did not exist in this case since T.S.H. did not have a "psychological parent." Furthermore, the trial judge explained in his memorandum opinion that, although the siblings had a very close relationship, he did not find evidence in the record that the children would experience serious detriment if placed in separate homes. The court awarded custody to Q.P. as of August 15, 1995, which permitted T.S.H. to complete the school year and provided a transitional period of increased visitation before the transfer of custody.

■ On appeal, the grandmother and intervenors urge that exceptional circumstances exist in this case, including: the extended family's support system; the strong bond between the sisters; and Q.P.'s fraudulent conduct to avoid discovering paternity.

■ A trial court's custody determinations are findings of fact which will not be disturbed on appeal unless clearly erroneous under Rule 52(a), N.D.R. Civ. P. *Schmidkunz v. Schmidkunz*, 529 N.W.2d 857 (N.D.1995). A finding is clearly erroneous when we are left with a definite and firm conviction that a mistake has been made. *Weber v. Weber*, 512 N.W.2d 723 (N.D.1994). In this instance, we do not believe that the trial court erred.

1. The record from the district court paternity action was not a part of the record on appeal.

2. We have recognized that under section 27–20–24(1), NDCC, hearings under chapter 27–20, NDCC, are to be conducted separately from those proceedings not included under section 27–20–03, NDCC. *See J.L.R. v. Kidder Cty. Soc. Serv. Bd.*, 295 N.W.2d 401 (N.D.1980). We have explained that divorce-related custody hearings are to be considered separately from deprivation proceedings. *In Interest of T.M.M.*, 267 N.W.2d 807 (N.D.1978); *but see In Interest of D.R.J.*, 317 N.W.2d 391, 393 (N.D.1982) [explaining that, "as a general rule, the jurisdiction of a juvenile court to exclusively make juvenile court determinations under Chapter 27–20, NDCC, ends when there is a finding of no continued deprivation," and that under exceptional circumstances, the juvenile court's jurisdiction is shared with the district court]. Likewise, custody determinations in a paternity action under section 14–17–14, NDCC, are appropriately considered in a proceeding separate from a hearing to determine whether a finding of deprivation should be continued. But, the appealing parties did not oppose the trial court's "consolidation" and have not raised the issue on appeal. *See J.L.R., supra* [petition for a writ of habeas corpus and a petition for declaration of deprivation were heard at the same time with the consent of the parties; combining proceedings did not adversely affect parties rights]. It is not evident that the parties' rights have been adversely affected in this instance, particularly since the children's mother is not a party to the appeal.

It is well established that natural parents have the right, superior to that of any other person, to the custody and companionship of their children. *Matter of Guardianship of Nelson*, 519 N.W.2d 15 (N.D.1994); *Worden v. Worden*, 434 N.W.2d 341 (N.D.1989); *Hust v. Hust*, 295 N.W.2d 316 (N.D.1980). We have also recognized that the right is not absolute. *Hust, supra.* In custody disputes between a natural parent and a third party, exceptional circumstances may require, in the child's best interest to prevent serious harm or detriment to the child, that the child be placed in the custody of a third party rather than with the natural parent. *Mansukhani v. Pailing*, 318 N.W.2d 748 (N.D.1982). Absent exceptional circumstances which trigger a best-interest analysis, the natural parent is entitled to custody of the child. *Worden, supra.*

As we stated in *Worden*, "[t]his court has not attempted to narrowly define or circumscribe the exceptional circumstances which must exist to permit a court to consider placing custody of a minor child with a third party rather than the natural parent." *Id.* at 342. However, as we explained in *Worden*, our prior cases analyzing such exceptional circumstances involved situations in which the third party seeking custody had a psychological-parent relationship to the child. *See Matter of Guardianship of Nelson*, 519 N.W.2d at 17 [illustrating our "long line of precedent" in which a psychological-parent relationship constituted an exceptional circumstance prevailing over a natural parent's custody right]; *Patzer v. Glaser*, 396 N.W.2d 740 (N.D.1986); *Mansukhani, supra; In Interest of D.R.J.*, 317 N.W.2d 391 (N.D.1982).

In this instance, the grandmother acknowledges that a psychological-parent relationship does not exist between T.S.H. and the intervenors. Rather, the grandmother urges that we expand the psychological-parent concept to include a "composite 'psychological parent,'" meaning that although no single extended family member has been a psychological parent to the children, as a group, the extended family has provided stability in the children's lives such as to create a support system for the children. Notwithstanding its importance, the extended fami-ly's involvement in the children's lives does not compare to the daily care and nurturing we have associated with a psychological-parent relationship. *See Dinius v. Dinius*, 448 N.W.2d 210, 217 n. 1 (N.D.1989) [Levine, J., dissenting] [quoting J. Goldstein, A. Freud & A. Solnit, Beyond the Best Interests of the Child (1973), that "[a] psychological parent is 'one who, on a continuing, day-to-day basis, through interaction, companionship, interplay, and mutuality, fulfills the child's psychological needs for a parent, as well as the child's physical needs.'"]; *Worden, supra* [explaining that a psychological parent has actual physical custody of the child for a sufficient period of time so as to develop the relationship]; *Patzer, supra* [describing a psychological parent as one who, by providing daily care, develops a close personal relationship with the child and becomes the person to whom the child turns for love, guidance, and security]. Such an expanded application of the "psychological parent" exception would easily consume the natural parent's right to custody of the child. Here, the trial court did not err by not recognizing the extended family's relationship as an exceptional circumstance.

As an extension of their first argument, the intervenors argue that T.S.H., who is seven years old, has a strong bond with E.J.H., who is fourteen years old, and that their relationship should be considered an exceptional circumstance. In *Worden*, we did not need to resolve whether a need to keep siblings together could, by itself, constitute an exceptional circumstance because we determined that there was no evidence in the record that separating the children would cause them serious detriment. Although there is testimony in this instance that separating E.J.H. and T.S.H. would be emotionally difficult, there is no evidence in the record that the children would suffer serious detriment. *See Patzer*, 396 N.W.2d at 744 (VandeWalle, J., concurring specially) [distinguishing between a short-term disruption and serious harm or detriment]. Some witnesses did express the need for a period of transition before Q.P. obtained custody of T.S.H. and, following the separation, the need for extensive visitation. The trial court addressed these concerns by ordering T.S.H.

to remain in the custody of Social Services until August 15, 1995, allowing time for T.S.H. and Q.P. to cultivate their relationship. Furthermore, the order provided for visitation following the transfer of custody, thus maintaining the sibling relationship and contact between T.S.H. and her maternal relatives. We conclude that the trial court did not err by splitting custody of the two children.

█ As their last argument, the intervenors contend that Q.P.'s fraudulent behavior to avoid determination of his paternity constitutes an exceptional circumstance overcoming his superior right as the natural parent to the custody of his child. In 1991, Q.P. was contacted to undergo blood testing to determine whether he was T.S.H.'s father. Rather than taking the test, Q.P. sent another individual to take the blood test. Due to the substitution, the test results excluded Q.P. as the father. In 1992, Q.P. requested of M.H. that they and T.S.H. undergo independent testing to determine paternity. The test results revealed a 99.99% probability that Q.P. was T.S.H.'s father, but Q.P. did not disclose the test results until he received notice of the deprivation proceedings. At trial, Q.P. offered testimony that he did not take the blood test in 1991 because he was fighting cancer and receiving radiation therapy. Q.P. is now "considered cured" of the cancer, with the only residual effect being that he is sterile due to the radiation treatments. The trial court considered Q.P.'s bout with cancer a mitigating circumstance for his behavior. In determining that Q.P. should be granted custody of his child, notwithstanding his absence, the trial court relied on Q.P.'s desire to be T.S.H.'s father and his increased involvement in T.S.H.'s life since November 1993. In this instance, the trial court did not err when it did not consider Q.P.'s absence or conduct to be an exceptional circumstance. *But see Matter of Adoption of A.M.B.*, 514 N.W.2d 670 (N.D. 1994) [recognizing that parental rights may be forfeited because of unfitness or abandonment]. Here, the trial court found Q.P. to be a fit parent.

After reviewing the record, we are not left with a definite and firm conviction that the trial court erred by not finding exceptional circumstances to justify considering whether custody of T.S.H. should be placed with the intervenors rather than with the natural father. Therefore, we affirm the trial court's order.

MESCHKE, J., and RALPH J. ERICKSTAD, Surrogate Justice, concur.

RALPH J. ERICKSTAD, Surrogate Justice, sitting in place of SANDSTROM, J., disqualified.

The Honorable MARY MUEHLEN MARING was not a member of the Court when this case was heard and did not participate in this decision.

NEUMANN, Justice, concurring.

I concur in the majority's opinion. I write separately to expand on the matters mentioned in footnotes 1 and 2, and to note the procedural quagmire that has resulted.

In North Dakota, our juvenile court is, by definition, "the district court of this state." N.D.C.C. § 27–20–02(6). That does not mean our juvenile court is simply another department of our district courts, like a civil department or a criminal department, something which exists only as an organizational device by which the district court seeks to manage its caseload. Our juvenile court is a creature of the legislature. Its jurisdiction is original, exclusive, and limited. N.D.C.C. § 27–20–03. Its authority is carefully defined and closely circumscribed, its dispositional options carefully specified, the duration of its dispositions strictly limited by legislative mandate. *E.g.*, N.D.C.C. §§ 27–20–08, –18 to –25, –37, –56.[1]

Our district courts, on the other hand, are constitutionally-created courts of general jurisdiction, N.D. Const. art. VI, § 1, operating under the procedural rules promulgated by this court. The district courts have "original

---

1.  The constitutionality of such legislatively mandated judicial procedure may be open to question. N.D. Const. art. VI, § 3 ("The supreme court shall have authority to promulgate rules of procedure, including appellate procedure, to be followed by all the courts of this state....").

jurisdiction of all causes, except as otherwise provided by law...." *Id.*, § 8.

Clearly, under chapter 27–20 of our code, the juvenile court had jurisdiction to hear the allegations of deprivation in this case, but it could make only certain carefully circumscribed dispositions. And clearly, under that same chapter, the juvenile court did not have jurisdiction to hear and determine custody disputes among the parties and intervenors. On the other hand, Article VI, section 8 of our Constitution clearly gives district courts, when they are not sitting as juvenile courts, authority to determine custody disputes.

Nevertheless, despite this clear distinction, and despite the legislature's clear limits on jurisdiction, both counsel and the trial court in this case agreed to the joinder of issues which the juvenile court had no authority to decide. The result has been an incomplete record for our review on appeal, confusion about the appropriate time to file a notice of appeal (30 days under N.D.C.C. § 27–20–56(1), or 60 days under Rule 4(a), N.D.R.App.P.), and questions about the applicable standard of review (*de novo* rehearing under N.D.C.C. § 27–20–56, or clearly erroneous under Rule 52(a), N.D.R.Civ.P.). Though the issue is not raised in this appeal, additional confusion may well occur in this case because of a juvenile court order which purports to grant custody of E.J.H. based only on the child's best interest, without a finding of continued deprivation, apparently without regard to requirements for a home study, N.D.C.C. § 27–20–30(1)(b)(1), and without regard to the statutory time limits placed on orders of the juvenile court. N.D.C.C. § 27–20–36.

Confronted with growing caseloads, a decrease in judgeships, and the expense of legal services, I cannot fault the court or counsel for their apparent desire to expedite those matters for the parties and their attempt to avoid a multiplicity of proceedings. Creativity and flexibility are going to be required as this state's judicial system moves into the next century with more work and fewer judges. But, we must also be very cautious that our creativity and flexibility do not take us beyond the bounds of our authority. Our judicial system's ability to function depends

almost entirely upon the people's confidence in the system to do its job fairly and justly. The image of a court acting beyond the limits of its jurisdiction and authority is not something likely to inspire such confidence.

I am able to concur in the majority's opinion only because the issues which concern me are not raised in this appeal. Had they been raised, I would be compelled to reverse.